## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## SPRINGFIELD - SOUTHERN DIVISION

| | |
|---|---|
| **TRACIE PATTON,** Individually and as a Representative of a Class of Participants and Beneficiaries on Behalf of the O'Reilly Automotive Profit Sharing and Savings Plan<br><br>**Plaintiffs,**<br><br>v.<br><br>**O'REILLY AUTOMOTIVE, INC., O'REILLY AUTOMOTIVE PROFIT SHARING AND SAVINGS PLAN, O'REILLY AUTOMOTIVE 401(K) PLAN INVESTMENT COMMITTEE, and DOES 1-10 INCLUSIVE,**<br><br>**Defendants.** | Case No. |

## CLASS ACTION COMPLAINT

1.      Plaintiff, Tracie Patton, individually and as representative of a class of participants and beneficiaries of the O'Reilly Automotive Profit Sharing and Savings Plan, brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§1001–1461, against Defendants, O'Reilly Automotive, Inc. (hereinafter "Company"), O'Reilly Automotive Profit Sharing and Savings Plan, (hereinafter the "Plan"), and O'Reilly Automotive 401(k) Plan Investment Committee ( hereinafter "Committee") and Does 1-10 (collectively, "Defendants") for: (1) breach of ERISA's fiduciary duties; (2) violation of ERISA's prohibited transaction rules; and (3) violation of ERISA's anti-inurement provision.

2.      ERISA requires a fiduciary to act "solely in the interest of participants," to do so with "the care, skill, prudence, and diligence" of a prudent person, "in accordance with the

1

documents and instruments governing the plan," and to refrain from "deal[ing] with the assets of the plan" in its own interest. 29 U.S.C. §§ 1104(a)(1), 1106(a)(1)(D), 1106(b)(1).

3.     The Eighth Circuit recognizes these duties as the highest known to the law. *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009).

4.     The Supreme Court warns ERISA fiduciaries that they are not immunized from their duties to plan participants when they purport to adhere to a plan document. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014) (explaining that compliance with a plan document does not necessarily mean a fiduciary has discharged its duties with the prudence required under ERISA).

5.     ERISA "Section 1106 supplements [a] fiduciary's general duty of loyalty to the plan's beneficiaries . . . by categorically barring certain transactions deemed 'likely to injure the pension plan.'" *Cunningham v. Cornell Univ.,* 604 U.S. 693, 697 (2025).

6.     As detailed below, instead of prudently and loyally evaluating how to allocate plan expenses and best deploy plan assets that had been forfeited by departing Plan participants, Defendants instead reflexively and exclusively used those forfeitures to benefit Company, to the detriment of the Plan and its participants, by applying over $24.1 million of Plan forfeitures to offset Company's contractual obligations to make Non-discretionary Matching Contributions to the Plan between 2019-2024, while only using $46,000 to defray Plan expenses. Defendants' unconsidered decision to use the lion's share of Plan forfeitures to benefit Company resulted in Plan participants paying around $14.3 million in Plan expenses to the Plan's third-party service providers, both directly and indirectly, that should never have come out of (or reduced the value of) their accounts. Even more egregious, during the class period the Plan Fiduciaries allowed an average of around $2.4 million dollars to sit in the unallocated forfeiture account at the end of each

2

year that Defendants could have used to defray virtually all of the Plan's direct expenses (an average of around $2.3 million dollars) for the preceding or subsequent plan year even *after* the Plan Fiduciaries used forfeitures to offset an average of around $4 million in Company contributions each year!

7.     To remedy these fiduciary breaches, Plaintiff, individually and as representative of a class of participants and beneficiaries of the Plan, brings this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' personal liability under 29 U.S.C. § 1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and prohibited transaction and to restore to the Plan any profits made through Defendants' use of the Plan's assets. In addition, Plaintiff seeks such other equitable or remedial relief for the Plan as the Court may deem appropriate. Plaintiff, individually and as representative of a class of participants and beneficiaries of the Plan, also brings the claims under 29 U.S.C. § 1132(a)(3) for appropriate equitable relief.

## <u>JURISDICTION AND VENUE</u>

8.     This Court has exclusive subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq*. Defendants are citizens of Missouri.

9.     This Court has personal jurisdiction over Defendants because their principal place of business is located in the Southern-Springfield Division of the Western District of Missouri, they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

10.     Venue is appropriate in the Southern-Springfield Division of the Western District of Missouri within the meaning of 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because some

or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

## PARTIES

11.     The Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34) that covers eligible employees of Company and is subject to the provisions of ERISA pursuant to 29 U.S.C. § 1103(a).

12.     Plaintiff Tracie Patton is a citizen of the State of Missouri, was previously employed by Company during the class period, and was a participant in the Plan during the class period. As such, she is a participant under ERISA § 3(7), 29 U.S.C. § 1002(7).

13.     During the class period, Plaintiff's individual account was charged, and Plaintiff paid expenses attributable to the maintenance and administration of the Investment Funds and the administration of the Plan to the Plan's third-party service providers.

14.     Plaintiff has Article III standing to bring this action on behalf of the Plan because he suffered actual injuries through the diminishment of his individual Plan accounts by administrative expenses that should have been paid for with Plan forfeitures. This injury is fairly traceable to Defendants' unlawful conduct in using Plan forfeitures for their own benefit by offsetting Company's contribution obligations when they could have used them for the benefit of the Plan and its participants by defraying administrative expenses, and this harm is likely to be redressed by a favorable judgment providing relief to the Plan.

15.     Having established Article III standing, Plaintiff may seek recovery for the entire Plan under 29 U.S.C. § 1132(a)(2).

16.     Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the misallocation of Plan forfeitures) necessary to understand that

Defendants breached their fiduciary duties and ERISA's prohibited transaction rules until shortly before this suit was filed.

17.     Company is an American automotive part retailer that provides automotive parts, tools, supplies, equipment, and accessories to professional service providers and do-it-yourself customers. Founded in 1957 by the O'Reilly family, Company operates more than 6,400 stores in 48 states, Puerto Rico, Mexico, and Canada.

18.     With over 87,000 participants and with over $1.8 billion in assets under management as of December 31, 2024, the Plan is one of the largest retirement plans in the country. Throughout the class period the plan was always larger than 99.95% of defined contribution plans in terms of both the number of participants and the value of its assets.

19.     Company is a publicly held company which reported $16.7 billion in annual revenue and over $2.3 billion in net profit in 2024.

20.     Company was Plan's sponsor (settlor or employer) under 29 U.S.C. § 1002(16)(B);

21.     Committee was Plan Administrator under 29 U.S.C. § 1002(16)(A) with broad authority over the administration and management of the Plan.  ("Administrator" or "Company Plan Fiduciaries").

22.     The defendants sued by the fictitious names DOES 1 through 10, inclusive, are Committee members unknown to Plaintiff who exercise or exercised discretionary authority or discretionary control respecting the management or disposition of its assets, or have had discretionary authority or discretionary responsibility in the administration of the Plan and are responsible or liable in some manner for the conduct alleged in the complaint. Plaintiff will amend this complaint to allege the true names and capacities of such fictitiously named defendants when they are ascertained.

## ERISA'S PURPOSE AS APPLIED TO DEFINED CONTRIBUTION PLANS

23.     ERISA exists, in large part, to protect the interests of participants, and their beneficiaries, in employee retirement plans. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (citing 29 U.S.C. § 1001(b)).

24.     Over the past several decades defined contribution plans, like the Company Plan, have become the primary savings vehicle for most Americans. By 2022, there were more than 121 million participants who were relying on benefits from defined contribution plans to provide some or all of their retirement benefits. *See* https://www.congress.gov/crs-product/R48470; *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008) ("Defined contribution plans dominate the retirement plan scene today.").

25.     Defined contribution plans allow employees to defer the payment of taxes on compensation contributed to the Plan. As a result, there are many IRS rules and regulations that define the requirements a plan must follow in order to receive the benefit of deferring taxes on contributions. To the extent that employers agree to make contributions to defined contribution plans, the employers also receive a tax benefit.

26.     A defined contribution plan "provides for an individual account for each participant and for benefits solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeiture of accounts of other participants which may be allocated to such participant's account." 29 U.S.C. § 1002(34). As such, a participant's retirement account in a defined contribution plan equals (1) the amount of the participant's voluntary contributions; plus (2) the amount of any employer contributions; plus (3) any investment returns on those contributions; minus (4) plan and investment expenses paid to third-party service providers. *Cunningham v. Cornell Univ.*, 604 U.S. 693, 697-98 (2025) (explaining that defined contribution

6

participants "maintain individual investment accounts within those plans, the value of which is determined by the market performance of employee and employer contributions, less expenses. Those expenses include fees paid to service providers.").

27. In addition, employers, like Company, also derive many other indirect benefits by virtue of sponsoring defined contribution plans. For example, in addition to tax benefits, retirement plans are critical tools for employers to attract and retain high quality employees. That is why plan sponsors rarely terminate plans or eliminate contributions to their plans, because doing so would put them at a substantial competitive disadvantage and make it much more difficult to attract and retain talented employees

28. As relevant to this case, under the circumstances prevailing well prior to the class period, it was and is understood that it is in the best interest of plan participants to enable them to participate in the potential for market earnings sooner rather than later. That general understanding applies to both contributions from employees as well as the allocation of forfeited plan assets and employer contributions.

29. For example, ERISA and DOL regulations reflect a clear and longstanding policy intent to ensure that contributions of Plan participants are promptly invested pursuant to the direction of each Plan participant and are not allowed to sit indefinitely in unallocated plan-level accounts, which are typically invested in cash or a cash equivalent thereby depriving plan participants from the potential for investment earnings. *See, e.g.*, DOL Advisory Opinion 2002-02A (requiring that plan fiduciaries minimize the time between employee deferrals and investment pursuant to plan participant direction); see also 29 C.F.R. § 2510.3-102 (noting that plan assets "include participant contributions as of the earliest date they can reasonably be segregated" from the

7

employer's general assets); DOL Field Assistance Bulletin 2008-01 (noting that participant contributions "that are withheld from wages or paid to the employer are delinquent if they become plan assets while still in the hands of the employer").[1]

30. Additionally, as relevant to this case, under the circumstances prevailing well prior to the class period, it was and is understood that plan expenses can have a dramatic detrimental impact on the retirement benefits provided by defined contribution plans. For example, according to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of 28% in savings at retirement.[2] Over a 40-year career, this difference in fees can reduce a participant's retirement savings by almost $500,000.[3]

31. Accordingly, participants are better off when their plan expenses are defrayed on an ongoing basis as the expenses are due and incurred. Thus, defraying plan expenses with forfeited plan assets as they occur provides an additional benefit to plan participants when evaluated

---

[1] *See also*, IRS "Retirement News for Employers," Vol. 7, Spring 2010 (stating forfeitures "must be used or allocated in the plan year incurred. The Code does not authorize forfeiture suspense accounts to hold unallocated monies beyond the plan year in which they arise."); 29 C.F.R. § 2510.3-102 (61 Fed. Reg. 41220, Aug. 7 1996) (noting that "the Department is concerned that participant contributions be paid promptly into the plan so as to begin to earn interest or other investment returns and to be available for the payment of benefits."); Field Assistance Bulletin No. 2002-03 (noting concern about interest earned "on contributions pending investment direction" and requiring that float be "regarded by plan fiduciaries and service providers as part of the service provider's compensation"). Accordingly, interest (float) earned on Forfeited Plan Assets sitting in an unallocated plan-level account both inures to the benefit of the employer when the plan fiduciaries use that interest (float) to reduce the employer's contributions and also deprives plan participants of the potential for investment earnings.

[2] U.S. Dept. of Labor *A Look at 401(k) Plan Fees,* at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/401k-plan-fees.pdf.

[3] Michael Bird, *Pandemic Highlights Reasons for Reviewing Plan Fees,* PLANSPONSOR, May 15, 2020, https://www.plansponsor.com/pandemic-highlights-reasons-reviewing-plan-fees/, *archived at* https://perma.cc/8VCU-E7PC.

*solely* in the interest of plan participants and for the exclusive purpose of providing benefits *and* defraying plan expenses (*see* discussion below).

## ERISA FIDUCIARY STANDARDS

32.     ERISA imposes strict duties of loyalty and prudence upon fiduciaries of retirement plans, like the Company Plan, that are covered by ERISA.

33.     Defendants are required by ERISA to: "discharge [their] duties with respect to a plan *solely* in the interest of the participants and beneficiaries and –  (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(A), (B) (emphasis added).

34.     ERISA explicitly requires plan fiduciaries to discharge their duties "solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

35.     ERISA's fiduciary duties are the "highest known to the law," *Bussian v. RJR Nabisco, Inc.,* 223 F. 3d 286, 294 (5th Cir. 2000); *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006).

36.     "[C]onflicts of interest can violate ERISA's loyalty requirement." *Pilkington PLC v. Perelman*, 72 F.3d 1396, 1401 (9th Cir. 1995).

37.     The duty of prudence imposed by 29 U.S.C. § 1104(a)(1) focuses on the thoroughness of a fiduciary's investigation before making a decision and asks "whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular" decision. *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 107 (2d Cir. 2021)

9

38.     A fiduciary's decision-making process is always evaluated based on "the circumstances then prevailing", *i.e.,* the facts the fiduciaries knew at the time or should have known had they employed a prudent process.  29 U.S.C. § 1104(a)(1)(B).

39.     "[A] claim for breach of the duty of prudence will survive a motion to dismiss if the court, based on circumstantial factual allegations, may reasonably infer from what is alleged that the process was flawed or that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident." *Sacerdote,* 9 F.4th at 108.

40.     Additionally, ERISA makes explicit that the fiduciary duties set forth above cannot be overridden by plan terms, stating that fiduciaries must follow plan terms *only* "insofar" as they are  "consistent with the provisions of this subchapter and subchapter III." 29 U.S.C. § 1104 (a)(1)(D).

41.     The Supreme Court warns ERISA fiduciaries that they are not immunized from their duties to plan participants when they purport to adhere to a plan document. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014) (explaining that compliance with a plan document does not necessarily mean a fiduciary has discharged its duties with the prudence required under ERISA).

42.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for, among other things, knowingly participating in a breach by another fiduciary or enables breaches by other fiduciaries.

43.     Under ERISA, a person is a fiduciary to the extent he or she: (1) exercises any discretionary authority or control over management of the Plan or the management or disposition of its assets; (2) renders investment advice regarding Plan assets for a fee or other direct

compensation, or has the authority or responsibility to do so; or (3) has any discretionary authority or control over Plan administration. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

44. Employers, like Company, "who sponsor ERISA plans wear 'two hats,' acting as an employer and plan sponsor when they engage in settlor functions such as establishing, funding, amending, or terminating the plan, and acting as a fiduciary when they administer or manage the plan." *Humana Health Plan. Inc. v. Nguyen*, No. H-13-1793, 2016 U.S. Dist. LEXIS 121098, at *28 (S.D. Tex. Sep. 8, 2016). Additionally, ERISA requires, "the fiduciary with two hats wear only one at a time, and wear the fiduciary hat when making fiduciary decisions." *Pegram v. Herdrich*, 530 U.S. 211, 225 (2000).

45. As a result, ERISA fiduciaries "violate their duty of loyalty when they act in the interests of the plan sponsor rather than with an eye single to the interests of the participants and beneficiaries of the plan." *Bussian,* 223 F.3d at 296 (quoting *Reich v. Compton*, 57 F.3d 270, 291 (3d Cir. 1995)).

46. Accordingly, the Company Plan Fiduciaries are fiduciaries because they are the Plan's Administrator (named fiduciary), vested with authority to manage and administer the Plan, and because they exercised discretionary authority with respect to allocating the Plan expenses and Plan forfeitures at issue here.

47. Company is also a fiduciary because it appointed the Plan Administrator (Company Plan Fiduciaries) and had a duty to monitor those fiduciaries.

48. Company is a party-in-interest because it is an employer "any of whose employees are covered by such plan." *Id.*, § 1002(14)(C).

49. Because Defendants are fiduciaries of the Plan and "deal[t] with the assets of the plan in [their] own interest or for [their] own account," they violated the fiduciary duty of

loyalty and engaged in prohibited transactions under both 29 U.S.C. § 1106(a)(1)(D) and 29 U.S.C. § 1106(b)(1), by benefiting themselves as far as reducing their own future contributions to the Company Plan, making it unnecessary to take money out of their corporate revenues to support the Plan.

## FACTS APPLICABLE TO ALL COUNTS[4]

### A. **The Plan**

50.     The Plan is a defined contribution plan pursuant to 29 U.S.C. §§ 1002(2)(A) and (34) and was created by Company for the sole benefit of its eligible employees.

51.     The Plan was created and funded several years prior to the class period.

52.     In accordance with 29 U.S.C. § 1103(a), the assets of the Plan are held in a trust fund "for the purpose of holding the assets of and funding the benefits provided by the Plan."

53.     The Plan's operating documents provide that assets of the Plan shall be used "for the exclusive purpose of providing benefit to Participants and Beneficiaries and defraying the reasonable expenses of administering the Plan."

54.     As an individual account, defined contribution retirement plan, a participant's retirement benefit in the Plan equals (1) the amount of the participants' voluntary contributions; *plus* (2) the amount of any employer contributions; *plus* (3) any investment returns on those contributions; *minus* (4) plan and investment expenses.

---

[4] Unless otherwise specified, the facts specific to the Plan in this section are taken from: (1) documents provided by Defendants to Plaintiff's counsel, including the Plan's operative governing documents during the class period; (2) Plaintiff's Plan documents; (3) the Plan's Form 5500s filed by Defendants with the Department of Labor and publicly available through the "DOL's" website at https://www.efast.dol.gov/5500Search/; and (4) other publicly available information about the Plan.

12

55.     As the employer and sponsor of the plan (also known as the settlor as that meaning is understood from trust law and used by the DOL in guidance), Company drafted and amended the Plan and intended it comply with the requirements of ERISA and the Internal Revenue Code of 1986, as amended.

**B.  Relevant Plan Terms**

### i.   *Eligibility*

56.     In general, all employees are eligible to participate in the Plan.

### ii.   *Company Mandatory Contributions*

57.     While the Plan allows for several types of employer contributions, relevant to this complaint, the Plan requires Company to make "Non-Discretionary Employer Matching Contributions" in the amount of 100% of the first 2% of Plan participants' contributions and 25% of the next 4% of Plan participants' contributions.

58.     According to Company's Form 5500 disclosure documents Company did not make any discretionary contributions throughout the class period. In other words, the only contributions made by Company throughout the class periods were the Non-Discretionary Employer Matching Contributions.

59.     While Company must pay all Non-Discretionary Employer Matching Contributions that have accrued throughout a calendar year to the Plan trustee within a reasonable period of time after the end of the prior calendar year, in practice at least for some portion of the class period Company made its Non-Discretionary Employer Matching Contributions to Plan Participants on a payroll basis.

60.     Upon their deposit into the Plan's trust fund, all participant contributions and Non-Discretionary Employer Matching Contributions become assets of the Plan.

*Vesting and Forfeiture of Non-Discretionary Employer Matching Contributions*

61.    Under the terms of the Plan, participants are immediately vested in their own contributions, as well as any actual earnings thereon. Participants generally are not 100% vested in Non-Discretionary Employer Matching Contributions (and any actual earnings on such amounts) until the completion of at least four years of employment.

62.    To the extent a participant is not 100% vested upon termination of employment, the participant forfeits the value of Company contributions and any actual earnings thereon (hereafter sometimes referred to as "Forfeited Plan Assets") in his or her account on the earlier of the date the participant takes a distribution of his or her vested interest in the Plan or the date the participant incurs a 12 month break in vesting service (within the meaning of the Plan document).

63.    The Plan instructs the Company Plan Fiduciaries that any Forfeited Plan Assets arising under the Plan for a given Plan Year and earnings thereon must be used to pay reasonable Plan expenses or offset employer contributions.

64.    Specifically, Section 11.09 of the Plan states that "[a]ny forfeitures occurring during a Plan Year shall be applied to reduce the contributions of the Employer. *Notwithstanding any other provision of the Plan to the contrary, forfeitures shall first be used to pay administrative expenses under the Plan, if so directed by the Employer. To the extent that forfeitures are not used to reduce administrative expenses under the Plan, as directed by the Employer, forfeitures will be applied in accordance with this Section 11.09."* (emphasis added).

65.    Additionally, the most current Plan Form 5500 states that "Forfeitures are retained in the Plan and may first be used to pay administrative expenses. Any remaining amounts will be used to reduce future employer contributions payable under the Plan."

14

66. Throughout the class period loyal fiduciaries were required to make decisions with respect to the allocation of Forfeited Plan Assets, "*solely* in the interest of the participants and beneficiaries and (A) for the *exclusive* purpose of: (i) providing benefits to participants and their beneficiaries; *and* (ii) defraying reasonable expenses of administering the plan." ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) (emphasis added).

### iii. *Plan Administration*

67. Throughout the class period, the Plan Fiduciaries had a fiduciary duty to determine how to allocate the Plan Expenses among Plan Assets. Among the options the Plan Fiduciaries were required to consider was the use of forfeitures to defray plan expenses.

68. Section 19.05 of the Plan provides in relevant part that "[a]ll reasonable costs and expenses (including legal, accounting, and employee communication fees) incurred by the Administrator and the Trustee in administering the Plan and Trust may be paid from the forfeitures (if any) resulting under Section 11.08, or from the remaining Trust Fund."

69. Throughout the class period, the Plan Fiduciaries caused the Plan to incur plan expenses through paying third-party service providers both direct and indirect compensation to provide services to the Plan. Hereafter the payment of Plan assets for services shall collectively be referred to as "Plan Expenses."[5]

70. Based on Company's disclosures to the DOL throughout the class period, the Plan paid Plan Expenses to, at a minimum, T. Rowe Price, Plante Moran Financial Advisors, CapFinancial Partners, Financial Engines, and Fidelity, to provide services to administer the Plan ranging

---

[5] The amount of Plan Expenses specifically identified in this Amended Complaint likely understate the actual Plan Expenses paid by Plan participants because the amounts do not include undisclosed indirect compensation paid by Plan participants.

from, among others, recordkeeping and information management, administration, account mainte-

nance, loan processing, claims processing, accounting (including auditing), contract administrator,

consulting, participant communication, and investment management. For example, the Plan dis-

closed to the DOL that Fidelity received $2,638,890 from Plan assets in direct compensation in

2023 as well as an undisclosed amount of indirect compensation.

71.     The terms of the plan document covering the application of forfeitures and the

costs of the administration of the Plan as well as the Plan's disclosures make clear that the Com-

pany, when acting as a settlor to design the plan, intended that the Plan Fiduciaries (including

Company when acting as a Plan Fiduciary through exercising control or discretion over Plan

assets) should act consistent with the provisions of ERISA such that Forfeited Plan Assets would

be expected to be used to defray Plan expenses absent some extraordinary circumstances.  See,

ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).[6]

72.     The use of Plan assets allocable to the accounts of Plan participants to pay Plan

Expenses reduces the funds available to Plan participants for distribution and/or investing—and

thereby reduces the value of individual participant accounts—and deprives the Plan participants

of assets that otherwise would have been earned on the amounts deducted or paid indirectly.

**C.  <u>Company Plan Fiduciaries' Use of Forfeited Plan Assets During the Class Period</u>**

73.     The Plan's Form 5500s, which are filed with the Department of Labor for each Plan

year and publicly available, detail the amount of Non-Discretionary Employer Matching

---

[6] It is also worth noting that Section 18.12 of the Plan Document provides that the "Trustee, the Employer and any other fiduciary shall discharge their duties under the Plan in accordance with the requirements of ERISA solely in the interests of Participants and their Beneficiaries and with the care, skill, prudence, and diligence under the applicable circumstances that a prudent man acting in a like capacity and familiar with such matters would use in conducting an enterprise of like character with like aims."

16

Contributions, the amount of Forfeited Plan Assets used to offset Company's Non-Discretionary Employer Matching Contributions, and the amount of Forfeited Plan Assets used to defray Plan Expenses. The Plan's Form 5500s for a given plan year are typically filed in the fall of the next calendar year.

74. From 2019 through 2024, Company was required under the terms of the Plan to make Non-Discretionary Employer Matching Contributions to the Plan and Plan Participants in the following amounts: (1) in 2019, at least $30,398,975[7]; (2) in 2020, at least $32,901,693; (3) in 2021, at least $36,285,518; (4) in 2022, at least $35,555,503; (5) in 2023, at least $92,301,601; and (6) in 2024, at least $59,942,714.

75. From 2019 through 2024 the Company Plan Fiduciaries were required under the terms of the Plan and ERISA to direct the use of Forfeited Plan Assets in the following minimum amounts: (1) in 2019, approximately $5,427,000[8]; (2) in 2020, approximately $5,204,000; (3) in 2021, approximately $5,708,000; (4) in 2022, $5,906,000; (5) in 2023, $7,801,000; and (6) in 2024, $8,500,000.

76. From 2019 through 2024, the Company Plan Fiduciaries decided to offset Company's obligation to make Non-Discretionary Employer Matching Contributions by allocating Forfeited Plan Assets in the following amounts: (1) in 2019, $2,800,000; (2) in 2020,

---

[7] Derived from the Plan's 2019-2024 Forms 5500s. For example, in 2019, the figure was derived from Company's disclosed contribution amount net of forfeitures of $27,598,975 plus $2,800,000 of Forfeited Plan Assets that were used to reduce Employer Contributions. This methodology was used for each subsequent year.

[8] Derived from the Plan's 2019-2024 Forms 5500s. For example, in 2019, the amount of $5,427,000 represents the $2,800,000 of Forfeited Plan Assets that were used during the year to offset employer contributions plus the $27,000 of Forfeited Plan Assets that were used to defray plan expenses plus $2,600,00 in unallocated Forfeited Plan Assets in the plan on December 31, 2019. This methodology was used for each subsequent year.

$2,700,000; (3) in 2021, $2,600,000; (4) in 2022, $3,100,000; (5) in 2023, $5,000,000; and (6) in 2024, $7,900,000. These actions saved Company these respective amounts each year, which flowed directly to its bottom-line profit.

77.     From 2019 through 2024, the Company Plan Fiduciaries caused Plan participants to pay Plan Expenses through deductions from their accounts and indirectly through revenue sharing or similar methods. The minimum direct amounts paid by Plan participants were: (1) in 2019, $2,704,236; (2) in 2020, $2,715,817; (3) in 2021, $3,005,531; (4) in 2022, $102,690; (5) in 2023, $2,855,970; and (6) in 2024, $3,142,880.[9]

78.     ERISA requires Company Plan Fiduciaries to use Forfeited Plan Assets to provide benefits and defray Plan Expenses as soon as administratively practicable. As of December 31, each year from 2019 through 2024, unallocated Forfeited Plan Assets remained unused in the following amounts: (1) in 2019, $2,600,000; (2) in 2020, $2,500,000; (3) in 2021, $3,100,000; (4) in 2022, $2,800,000; (5) in 2023, $2,800,000; and (6) in 2024, $600,000. At all times during the class period it was administratively feasible to use Forfeited Plan Assets to provide retirement benefits and pay Plan Expenses and avoid carrying these amounts in an unallocated plan account over to the next calendar year.

79.     From 2019 through 2024, the Plan Fiduciaries disclosed to the DOL that it directed only $46,000 to defray Plan Expenses out of over $38,546,000 in Forfeited Plan Assets available for direction by the Plan Fiduciaries.

---

[9] The amount of Plan Expenses specifically identified in this Complaint understates the actual Plan Expenses paid by Plan Participants because the amounts do not include undisclosed indirect compensation paid by Plan Participants. For example, the Plan participants paid well over $1,000,000 in Plan Expenses through indirect compensation (revenue sharing) throughout the class period and the $102,690 of direct compensation disclosed clearly does not encompass all the Plan's expenses that year.

80.     In other words, throughout the class period Defendants used only around 0.12% of the Forfeited Plan Assets available for direction to defray Plan Expenses. A prudent and loyal fiduciary presented with these circumstances would not have directed millions of dollars to offset future company contributions and while also directing virtually none of the Forfeited Plan Assets to defray plan expenses and also allowing millions of dollars to be unused each year when Plan participants shouldered millions of dollars in administrative expenses. In fact, in most of the years of the class period the amount of Forfeited Plan Assets the Plan Fiduciaries allowed to sit in an unallocated account at the end of each year represented more than 90% of the direct compensation paid by the Plan in those years. These actions by the fiduciaries, at a minimum, necessitate the inference that imprudence or disloyalty was at play in their decision-making process.

81.     The following chart demonstrates the Plan Fiduciaries' disloyal and conflicted use of forfeitures during the class period:

| YEAR | MINIMUM FORFEITURES USED TO OFFSET COMPANY CONTRIBUTIONS | FORFEITURES USED FOR PLAN ADMIN EXPENSES | MINIMUM DIRECT COMPENSATION PAID BY THE PLAN AND PARTICIPANTS | FORFEITURES BALANCE AT YEAR END LEFT IN UNALLOCATED ACCOUNT |
|---|---|---|---|---|
| 2019 | $2,800,000 | $27,000 | $2,704,236 | $2,600,000 |
| 2020 | $2,700,000 | $4,000 | $2,715,817 | $2,500,000 |
| 2021 | $2,600,000 | $8,000 | $3,005,531 | $3,100,000 |
| 2022 | $3,100,000 | $6,000 | $102,690 | $2,800,000 |
| 2023 | $5,000,000 | $1,000 | $2,855,970 | $2,800,000 |
| 2024 | $7,900,000 | $0 | $3,142,880 | $600,000 |
| **Total** | **$24,100,000** | **$46,000** | **$14,527,124** | **$14,400,000** |

82.     Upon information and belief, the Company Plan Fiduciaries have continued to violate ERISA in their use of Forfeited Plan Assets.

**D.  <u>ERISA's Duty of Prudence as Applied to Forfeited Plan Assets</u>**

83. Well prior to the class period, like all prudent defined contribution plan fiduciaries and plan sponsor/employers/settlors, the Company Plan Fiduciaries knew that a defined contribution "plan will not be qualified unless all funds are allocated to participants' accounts in accordance with a definite formula in the plan." *See also*, IRS "Retirement News for Employers," Vol. 7, at 4, Spring 2010 (citing to IRS Revenue Ruling 80-155).

84. Similarly, all prudent defined contribution plan fiduciaries and employers knew that to ensure their plans remained qualified under the IRS Code, there were only a few allowable uses of forfeited plan assets, primary among them being to defray plan expenses or reduce employer contributions. *Id.*

85. Accordingly, when designing their plan, employers had a few limited options to choose from with respect to the treatment of forfeited plan assets. Employers that wanted all forfeited plan assets to be used first to reduce employer contributions prior to defraying plan expenses could have drafted the terms of the plan to explicitly require that (as some did).

86. Indeed, during the class period, several other large plan sponsors drafted their plans to specifically require forfeited plan assets to be used to offset the employer's matching and discretionary contributions before being used to defray plan expenses, while others even prohibited using forfeited plan assets to defray plan expenses.

87. On the opposite end of the spectrum, some plans preclude or limit forfeited plan assets from being used to reduce employer contributions.

88. In between these two poles are plans—like the Plan here—that accord discretion to their fiduciaries to use forfeited plan assets either to defray plan expenses or to offset employer contributions. In those instances, plan fiduciaries, as with any exercise of discretion over the use

of plan assets, must use a prudent process to determine which of the allowable uses of forfeited plan assets would be consistent with their fiduciary duties.

89.     A plan fiduciary that exercises discretion to use forfeited plan assets to defray plan expenses is not providing a benefit greater than what was required or intended by the plan sponsor/employer (settlor). Rather, plans that grant discretion to plan fiduciaries to choose among multiple different options for allocating forfeited plan assets, including to defray plan expenses, necessarily contemplate that plan expenses will be defrayed if doing so accords with ERISA's fiduciary standards. As noted above, employers were always aware that they could design the plan to prevent the use of Forfeited Plan Asset to defray plan expenses.[10]

90.     There is no dispute that under the terms of the Plan, defraying Plan Expenses is an allowable use of Forfeited Plan Assets.

91.     The terms of the Plan require the Company Plan Fiduciaries to exercise its discretion related to the use of Forfeited Plan Assets and determine whether defraying Plan Expenses was more consistent with its duties under the Plan and ERISA than using Forfeited Plan Assets to offset Non-Discretionary Employer Matching Contributions.

92.     Accordingly, throughout the entire class period, a prudent fiduciary as part of a prudent fiduciary process would have always considered whether using Forfeited Plan Assets to defray Plan Expenses was more consistent with their duties under the plan and ERISA than using Forfeited Plan Assets to offset Non-Discretionary Employer Matching Contributions. As set forth in detail below, the facts and circumstances here support a finding that, throughout the class

_____

[10] It is worth noting that it is a settlor function to decide whether or not to provide a discretionary match (unconstrained by any fiduciary duties to plan participants) whereas decisions regarding the use of forfeited plan assets are constrained by ERISA's fiduciary duties.

21

period, a prudent fiduciary of the Plan, employing a prudent process would have chosen to use Forfeited Plan Assets to defray substantially all Plan Expenses during the class period.

93.     Prudent Plan fiduciaries would investigate alternatives and preferences set forth in the Plan to determine how the Plan Expenses would be paid and how to direct the use of Forfeited Plan Assets consistent with ERISA and the terms of the Plan.

94.     In making that determination, the Plan Fiduciaries were required wear only their fiduciary hat and be guided by ERISA's requirement that the determination would be made *solely* in the interest of the Plan participants and for the *exclusive* purpose of providing benefits *and* defraying plan expenses. *See* ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

95.     A prudent independent and non-conflicted Plan Fiduciary would have no reason to fail to use forfeited plan assets to defray plan expenses when that was an allowable option under the terms of the Plan.

96.     Additionally, in its Retirement News for Employers Newsletter from Spring 2010, the IRS published an article entitled "*Fixing Common Plan Mistakes: Improper Forfeiture Suspense Accounts,*" discussing IRS Publication 4278-B (2010), p4278.pdf (irs.gov).

97.     In pertinent part, that article states: "Forfeitures must be used or allocated in the plan year incurred. The Code does not authorize forfeiture suspense accounts to hold unallocated monies beyond the plan year in which they arise. Revenue Ruling 80-155 states that a defined contribution plan will not be qualified unless all funds are allocated to participants' accounts in accordance with a definite formula defined in the plan. This would preclude a plan from carrying over Forfeited Plan Assets to subsequent plan years, as doing so would defy the rule requiring all monies in a defined contribution plan to be allocated annually to plan participants."

Case 6:26-cv-03015-LMC     Document 1     Filed 01/15/26     Page 22 of 47

98. The same article states that "[t]he plan document's terms should have provisions detailing how and when a plan will exhaust plan forfeitures. A plan's failure to use forfeitures in a timely manner denies plan participants additional benefits or reduced plan expenses."

99. The IRS concludes that "this failure can be corrected by reallocating all forfeitures in the plan's forfeiture suspense account to all plan participants who should have received them had the forfeitures been allocated on time."

100. As described above, the Plan Fiduciaries consistently allowed Forfeited Plan Assets to sit in an unallocated plan account at the end of each plan year in amounts that could have been used to defray substantially all Plan Expenses.

E. **The Company Plan Fiduciaries' Breaches of the Duty of Prudence**

*Violation of Plan Documents*

101. There is a reasonable interpretation of the terms of the Plan document that Plan Fiduciaries do not have discretion related to the use of Forfeited Plan Assets that were forfeited by Plan Participants.

102. The Plan document specifically sets forth how Forfeited Plan Assets shall be used as follows:

> **11.09. Application of Forfeitures.** Any forfeitures occurring during a Plan Year shall be applied to reduce the contributions of the Employer. Notwithstanding any other provision of the Plan to the contrary, forfeitures shall first be used to pay administrative expenses under the Plan, if so directed by the Employer. To the extent that forfeitures are not used to reduce administrative expenses under the Plan, as directed by the Employer, forfeitures will be applied in accordance with this Section 11.09.

103. Despite the inclusion (twice) of "if so directed by the Employer," this provision also twice contains the word "shall."

104.     If the first sentence of Section 11.09 is read in isolation, it can be reasonably understood that any forfeitures "shall" be applied to reduce Employer contributions.

105.     However, the next sentence completely eviscerates the first sentence by beginning "Notwithstanding any other provision of the plan to the contrary" which indicates that what follows may take precedence over the prior sentence.

106.     The next sentence continues by stating that "forfeitures shall first be used to pay administrative expenses under the Plan, if so directed by the employer."

107.     There is an inherent conflict within this sentence. Is it mandatory for forfeitures to be used first to pay administrative expenses or does the employer retain discretion for forfeitures to be used for something else?

108.     Other provisions of the Plan Document also shed light on the intended interpretation of Section 11.09. For example, Section 19.06 provides in relevant part that "[a]ll reasonable costs and expenses (including legal, accounting, and employee communication fees) incurred by the Administrator and the Trustee in administering the Plan and Trust may be paid from the forfeitures (if any) resulting under Section 11.08, or from the remaining Trust Fund."

109.     As Company decided on this plan language and Plaintiff was forced to abide by it as a participant, it is reasonable to construe this language against the drafter and interpret the language as requiring forfeitures to be used first to pay administrative expenses.  Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 114 (2012) ("[W]hen the word ***shall*** can reasonably be read as mandatory, it ought to be so read.").

110.     At the very least, discovery is required to determine which of the two possible interpretations of the second sentence was intended by Company Plan Fiduciaries and subsequently whether Plaintiff's interpretation is reasonable under the circumstances.

24

### i. *Fiduciaries Misallocate Forfeited Plan Assets to Matching Contributions*

111. As noted above, even if the Plan may be interpreted to provide discretion on the use of Forfeited Plan Assets, ERISA's fiduciary duty of prudence is violated where, as here, first the Company Plan Fiduciaries were required to determine how to allocate Plan Expenses to the Plan when the use of Forfeited Plan Assets is among the available options. As a result, the Company Plan Fiduciaries were faced with a decision each year in choosing between allocating Forfeited Plan Assets toward offsetting Non-Discretionary Employer Matching Contributions or defraying Plan Expenses that would otherwise be borne by Plan participants. By failing to conduct any investigation as to which choice would be in the best interest of the participants, the Plan Fiduciaries decided to allocate virtually all Plan Expenses to Plan Participants despite there being no dispute that using Forfeited Plan Assets to defray Plan Expenses was the decision that would be consistent with a duty to discharge their duties solely in the interest of Plan Participants for the exclusive purpose of defraying Plan Expenses and providing retirement benefits to Plan Participants.

112. If the Company Plan Fiduciaries had employed a prudent process every year immediately prior to and throughout the class period, the Company Plan Fiduciaries would have used the Forfeited Plan Assets to defray all or substantial amounts of Plan Expenses.[11]

---

[11] In other words, to the extent that the Forfeited Plan Assets exceeded the foreseeable future ongoing Plan Expenses of the Plan as evaluated *solely* in the interest of Plan participants and for the *exclusive* purpose of providing benefits to participants *and* defraying the Plan Expenses of the Plan, then the Forfeited Plan Assets could have been used to defray a significant amount of the Plan's expenses while also offsetting a portion of Company's Non-discretionary Company Matching Contributions. The Defendants are solely in the possession of the documents that would be necessary to review and evaluate the Fiduciaries' determination not to use Forfeited Plan Assets to defray Plan expenses.

113. In fact, however, the Company Plan Fiduciaries allocated hardly any of the Forfeited Plan Assets to defray Plan Expenses.

114. Because the Company Plan Fiduciaries always had the ability to defray Plan Expenses with Forfeited Plan Assets but hardly ever did (from 2019 through 2024 less than .2% of all available Forfeited Plan Assets were used for defraying Plan Expenses), it is reasonable to infer that the Company Plan Fiduciaries employed a flawed decision-making process or did not employ any process at all to determine how to allocate Forfeited Plan Assets.

115. Consequently, an objective analysis of the available options throughout the class period, guided by ERISA's fiduciary duty of prudence would indisputably not result in Plan Fiduciaries choosing to use nearly all Forfeited Plan Assets available to offset future Non-Discretionary Employer Matching Contributions year after year throughout the class period instead of using Forfeited Plan Assets to defray some or all Plan Expenses.

116. Instead of acting prudently by using Forfeited Plan Assets to defray Plan Expenses charged to the individual accounts of Plan participants on an ongoing basis, the Company Plan Fiduciaries chose to use virtually all the Forfeited Plan Assets (more than 99.81%) for the purpose of offsetting Company's Non-Discretionary Employer Matching Contributions to the Plan, thereby saving Company millions of dollars at the expense of the Plan.

117. Prudent fiduciaries following a prudent process would not choose to offset Company's Non-Discretionary Employer Matching Contributions instead of reducing the Plan participants' Plan Expenses.

118. The Company Plan Fiduciaries' conduct, at the very least, necessitates the inference that either it did not have processes in place to weigh the benefits to participants of allocating Forfeited Plan Assets or, alternatively, the process employed was fatally flawed.

### ii.    *Failure to use Unallocated Forfeited Plan Assets*

119.    The Company Plan Fiduciaries were required to monitor Forfeited Plan Assets and should have ensured that all Forfeited Plan Assets for the plan year were promptly exhausted by year end or shortly thereafter and did not remain in an unallocated Plan account.

120.    Even though there were sufficient unallocated Forfeited Plan Assets to defray some or all of the Plan Expenses during each year of the class period, Company Plan Fiduciaries nevertheless chose to allow the unallocated Forfeited Plan Assets in each year to remain unused.

121.    A prudent fiduciary employing a prudent process would at a minimum of once a year, coordinate with the Plan's recordkeeper to determine the amount of unallocated Forfeited Plan Assets available and determine expectations related to the amount of forfeitures each year in relation to the expected Plan Expenses. To the extent there were unallocated Forfeited Plan Assets, a prudent fiduciary would evaluate how to use the unallocated Forfeited Plan Assets solely in the interest of the participants and beneficiaries. *See* 29 U.S.C. § 1104(a)(1).

122.    The Company Plan Fiduciaries, following a prudent process, would not have allowed millions in Forfeited Plan Assets to accumulate in an unallocated plan level account when the Plan's terms give the Company Plan Fiduciaries the discretion to use Forfeited Plan Assets to defray Plan Expenses, especially when the amount of the Forfeited Plan Assets that remained at the end of each calendar year could substantially defray Plan Expenses during the class period.

123.    The Company Plan Fiduciaries did not, for example, investigate whether there was any set of circumstances that would support a decision to not use unallocated Forfeited Plan Assets to defray Plan Expenses and allow millions of Plan assets to go unused.

27

124. The Company Plan Fiduciaries' repeated practice of failing to promptly allocate Forfeited Plan Assets show that the Company Plan Fiduciaries either had no prudent process in place to determine how to use Forfeited Plan Assets or, alternatively, employed a flawed process.

125. The Company Plan Fiduciaries violated its fiduciary duty of prudence by not using unallocated Forfeited Plan Assets, thereby causing Plaintiff and other Plan participants to pay for millions in Plan Expenses that should have otherwise been defrayed.

126. Here, under the circumstances described, it is reasonable to infer that the Company Plan Fiduciaries did not employ a prudent fiduciary decision-making process and thus breached their fiduciary duty of prudence. *See e.g., Sacerdote v. N.Y. Univ.,* 9 F.4th 95, 108-09 (2d Cir. 2021) ("[We] caution against overreliance on . . . other ERISA cases as benchmarks. While such comparisons may sometimes be instructive, their utility is limited because the assessment of any particular complaint is a context-specific task. We cannot rule out the possibility that a fiduciary has acted imprudently by including a particular fund even if, for example, the fees that fund charged are lower than a fee found not imprudent in another case.").

F. **The Company Plan Fiduciaries' Breaches of the Duty of Loyalty**

127. Throughout the class period loyal fiduciaries were required to make decisions with respect to the allocation of Forfeited Plan Assets, "solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

128. As discussed above, the Company Plan Fiduciaries made the fiduciary decision to allocate virtually all the Plan Expenses to the accounts of Company Plan Participants (or causing the use of indirect compensation to reduce the value of the accounts of Plan Participants).

28

129. As a result, the Company Plan Participants only used a tiny fraction of Forfeited Plan Assets to reduce the Plan's Expenses.

130. Using Forfeited Plan Assets to reduce current and future employer contributions is always in the best interest of Company because that option decreases Company's own contribution costs and means that Company does not need to take money out of its own general revenues to pay for Non-Discretionary Employer Matching Contributions.

131. In deciding between using the Forfeited Plan Assets to benefit Company or Plan participants, Company Plan Fiduciaries are presented with a conflict of interest in administering the Plan and managing and disposing of their assets.

132. In using Forfeited Plan Assets almost exclusively to reduce its own employer contributions from 2019-2024, even though it was permitted (and arguably, required) to use those Forfeited Plan Assets to defray Plan Expenses for participants, Company, while acting in its fiduciary capacity as Plan Fiduciaries, was motivated solely by its settlor/employer self-interest and breached their duty of loyalty.

133. To be clear, as described above, Plaintiff does not allege that ERISA prohibits fiduciaries from *ever* using Forfeited Plan Assets to offset company contributions. Rather, Plaintiff alleges that under the specific facts and context of this Plan—where the Company Plan Fiduciaries were accorded discretion by the Plan over how to allocate Forfeited Plan Assets—a prudent and loyal fiduciary would not make the decisions that the Company Plan Fiduciaries made (as alleged above).

134. In fact, had the Plan Fiduciaries acted prudently and loyally throughout the class period, the Plan Fiduciaries should have used Forfeited Plan Assets to defray substantially all

Plan Expenses and then still would have been able to allocate millions of dollars to offset the Non-Discretionary Employer Matching Contributions.

135. In summary, the totality of the specific facts and circumstances of the Plan and the conduct of the Company Plan Fiduciaries throughout the class period demonstrates that the Company Plan Fiduciaries failed to administer the Plan in a prudent and loyal manner.

### G. Transactions Prohibited by ERISA

136. ERISA's prohibited-transaction provisions impose "categorical" restrictions designed to protect plan assets from conflicted, insider transactions. *See Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241–42 (2000).

137. Section 406(a) prohibits fiduciaries from causing a plan to engage in certain transactions with parties in interest, including any "transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D).

138. Section 406(b) separately prohibits fiduciaries from "deal[ing] with the assets of the plan in [their] own interest," *id*. § 1106(b)(1), or "act[ing] in a transaction" involving plan assets "on behalf of a party… whose interests are adverse to the interests of the plan," *id*. § 1106(b)(2).

139. *Cunningham v. Cornell University*, 604 U.S. 693 (2025), reinforces that ERISA § 406(a) imposes "categorical" prohibitions on certain transactions and that plaintiffs need only plead the statutory elements of § 406(a)(1) to state a claim. *Id.* at 700.

140. *Cunningham* makes clear that § 1106(a)(1)'s prohibitions apply whenever a fiduciary causes a plan to engage in a transaction falling within the statutory language. Although *Cunningham* did not address the meaning of "use" under § 406(a)(1)(D) or the application of forfeitures to reduce employer contributions, those questions are resolved by the growing body of

forfeiture-specific cases, many of which hold that a fiduciary "uses" plan assets for the employer's benefit when it applies forfeitures to reduce employer contributions—even where no funds leave the plan trust.

141. When a fiduciary applies forfeitures in a manner that relieves the employer of a financial obligation, the fiduciary has engaged in a prohibited "use" of plan assets, even without a literal transfer of funds.

142. An employer's reallocation of undisputed plan assets to reduce its own matching contribution is a 'use' of plan assets for the purposes of § 1106(a)(1)(D). This is because allocating forfeitures to reduce employer contributions is not an internal bookkeeping measure—it is a disposition of plan assets that directly benefits the employer.

143. A party in interest includes an employer whose employees are covered by the plan. 29 U.S.C. § 1002(14)(C).

144. Company saved millions of dollars in employer contributions by using forfeitures to satisfy obligations it otherwise would have paid from corporate funds.

145. That is a direct "transfer to" or "use for the benefit of" a party in interest under § 406(a)(1)(D).

146. The allocation of forfeitures to reduce employer contributions necessarily reduces the employer's financial obligation to the Plan. Forfeiture allocation operates "between" the plan and employer because it alters the employer's contribution obligations, violates § 406(a)(1)(D).

147. Similarly, Section 406(b)(1) bars a fiduciary from "deal[ing] with the assets of the plan in his own interest," and § 406(b)(2) prohibits a fiduciary from acting for the benefit of a party adverse to participants. Plaintiff alleges that Company acted in both capacities—first, as fiduciary allocating forfeitures, and second, as employer who benefited directly from that allocation.

148. A fiduciary breaches § 406(b) when it uses plan assets in a manner that relieves the employer of financial obligations.

149. Because Company's allocation decisions relieved itself of substantial financial obligations while providing no corresponding benefit to Plan participants, prohibited self-dealing exists under § 406(b).

150. Reducing employer contributions is not merely an "intra-plan transfer" and is a "transaction" under § 406.

151. An intra-plan movement of assets constitutes a prohibited transaction if it: (1) involves plan assets; (2) benefits a party in interest or fiduciary; and (3) results from a fiduciary decision.

152. Company caused plan assets to be used to reduce its own contribution obligations. That is "dealing with" and "using" plan assets in a manner § 406 squarely prohibits, and thus, Company engaged in transactions prohibited by both § 406(a) and § 406(b).

**H. <u>Self-Dealing</u>**

153. From 2019 through 2024, the Plan Fiduciaries caused, directed, and authorized tens of thousands of transactions, both directly extracting money from the accounts of Plan participants or indirectly by reducing the net value of investment options held by Participants in the Plan, causing Plan Participants to pay around $14.5 million directly for Plan Expenses as well as additional amounts indirectly to the Plan's third-party administrators that should have been covered fully or in part by Forfeited Plan Assets.

154. These direct transactions are memorialized in Plan level accounting, *e.g.*, a trust report of the Plan. In this case the Plan Fiduciaries chose to use a non-transparent fee methodology to cover plan expenses to hide the plan expenses from plan participants by requiring the Plan's

Expenses to be paid from the total annual operating expenses of the Plan's investment options. As a result, the Plan Fiduciaries caused the Plan to engage in thousands of transactions that resulted in a portion of the total annual operating expenses of the Plan's investment options to be paid by Plan participants to the managers of the Plan's investment options who, in turn, sent a portion of that revenue back to the Plan to be held in a plan level account and used to pay the Plan expenses directly (and indirectly as well-see below) to the Plan's service providers.

155.    Moreover, throughout at least a portion of the class period, Defendants directed and authorized Plan Participants to pay an indeterminable amount of indirect compensation for Plan Expenses. The amount of indirect compensation paid by Plan participants to cover Plan Expenses is not able to be calculated by the documents available to Plaintiff and is in the possession of the Defendants who have not provided that information to Plaintiff.

156.    Had the Defendants acted in accordance with the terms of the Plan document and ERISA the Defendants should have directed the use of Forfeited Plan Assets to defray the Plan Expenses that Defendants instead required Plan Participants to directly pay through transactions from their individual accounts or indirectly through the operating expense of the investment options in the Plan.

157.    Throughout the class period, Defendants also caused the Plan to engage in several transactions with Company, a party in interest, related to Company's contractual obligation to make Non-Discretionary Employer Matching Contributions to the Plan. For each of these transactions, the Plan Fiduciaries coordinated with the third-party recordkeeper and Company to calculate how much Company could reduce its obligatory payment to the Plan by offsetting the full amount owed with the use of Forfeited Plan Assets.

33

158.     In each of these instances, Defendants caused the Plan to engage in a transaction with Company that directly resulted in a smaller amount of money being paid by Company into the Plan.

159.     In other words, several times throughout the class period the Plan Fiduciaries engaged in calculations for the express purpose of calculating how much money Company could save from its contractual obligation to the Plan by using Forfeited Plan Assets to offset the amount of Company's contribution.

160.     As noted above, each of these transactions are also memorialized in the Plan trust reports.  Each of these transactions then serves to provide the assets necessary to execute thousands of transactions to invest Non-Discretionary Employer Matching Contributions and Forfeited Plan Assets pursuant to the investment instructions of Plan Participants.

161.     In other words, each of these transactions involves the receipt of Non-Discretionary Employer Matching Contributions and calculations related to Forfeited Plan Assets to enable a combination of Forfeited Plan Assets and Non-Discretionary Employer Matching Contributions to be combined for use in following the investment instructions of thousands of Plan Participants.

162.     In other words, throughout the class period, the Plan Fiduciaries engaged in the conduct of making calculations that caused the Plan to receive at least $24 million less in Non-Discretionary Employer Matching Contributions than what Company was obligated to make and which increased Company profits by at least $24 million.

163.     Additionally, the Defendants caused the Plan to engage in these transactions with Company that constituted and resulted in the use of Forfeited Plan Assets for the direct and indirect benefit of Company, a party in interest and Plan fiduciary.

34

164. Throughout the Class Period, by directing, authorizing, and causing several transactions with Company and tens of thousands of transactions with Plan Participants, Defendants dealt with the Forfeited Plan Assets in their own individual interest and in Company's interest by using Forfeited Plan Assets to offset Company's contractual obligations to the Plan.

165. Throughout the Class Period, by directing, authorizing, and causing several transactions with Company and tens of thousands of transactions with Plan Participants, the individual Plan Fiduciaries acted in their individual capacity and as agents of a party in interest, *i.e.*, Company, whose interests are adverse to the Plan or Plan Participants.

166. Throughout the Class Period, by directing, authorizing, and causing several transactions with Company and tens of thousands of transactions with Plan Participants, the individual Plan Fiduciaries received consideration for their own personal accounts from Company as a result of their control over the transactions described above with a party in interest, *i.e.*, Company, involving the Forfeited Plan Assets, that enabled Company to reduce its costs and increase its profits thereby benefiting each individual Plan Fiduciary.

## CLASS ACTION ALLEGATIONS

167. ERISA authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a). *See* 29 U.S.C. § 1132(a)(2).

168. In acting in their representative capacity for the Plan, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representative of, the following class:

> All participants and beneficiaries of the Company Holdings Corporation Retirement Savings Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning September 4, 2019, and running through the date of judgment.

35

169.    The class includes over 30,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

170.    There are questions of law and fact common to this class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Thus, common questions of law and fact include but are not limited to the following:

a.    Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);
b.    Whether Defendants breached their fiduciary duties to the Plan with respect to their management and allocation of Forfeited Plan Assets;
c.    Whether Plan Fiduciaries engaged in prohibited transactions with Forfeited Plan Assets;
d.    What are the losses to the Plan resulting from each alleged breach of ERISA; and
e.    What Plan-wide equitable and other relief the Court should impose to remedy Defendants' alleged breaches.
f.    Did fiduciaries of the Plan violate the anti-inurement provision of ERISA by using Plan assets for their own benefit?

171.    Plaintiff's claims are typical of the claims of the class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a participant during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct.

172.    Plaintiff will adequately represent the class pursuant to Federal Rule of Civil Procedure 23(a)(4), because he was a participant in the Plan during the class period, has no interest that conflicts with the class, is committed to the vigorous representation of the class, and has engaged experienced and competent lawyers to represent the class.

173.    Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that

36

would establish incompatible standards of conduct for Defendants concerning their discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

174. Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

175. Plaintiff's attorneys have substantial and varied experience in complex ERISA and class action litigation and will adequately represent the class.

## <u>COUNT I</u>
**Breach of the Duty of Prudence Under 29 U.S.C. 1104(a)(1)(D) By the Company Plan Fiduciaries for Failure to Discharge Plan Documents in Accordance With ERISA**

176. Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

177. As alleged herein, 29 U.S.C. 1104(a)(1)(D) imposes a fiduciary duty to act in accordance with the Plan documents and instruments governing the Plan.

178. A reasonable interpretation of the language in the Plan documents required the Defendants to use the Forfeited Assets in Accounts to pay expenses of administration of the Plan. Defendants failed to discharge their duty to act in accordance with the Plan document by using Forfeited Plan Assets to reduce employer contribution obligations in violation of the explicit Plan terms.

37

179. At the very least, there are conflicting interpretations of the Plan language regarding use of Forfeited Plan Assets that may be construed against the Company Plan Fiduciaries as drafter of the Plan document.

180. Defendants caused losses to the Plan by forcing Plan participants and beneficiaries to incur avoidable Plan Expenses. These losses resulted in less money invested in the Plan and lost investment returns.

181. As a direct and proximate result of Defendants' fiduciary breaches, the Plan and the Class suffered injury and loss for which Defendants are personally liable and are subject to appropriate equitable relief, pursuant to 29 U.S.C. § 1109, including, without limitation, the disgorgement of all ill-gotten profits to Defendants resulting from the breach of their duty of loyalty. Each Defendant is also subject to other equitable or remedial relief as appropriate.

182. Each Defendant knowingly participated in the breach of the other Defendants, knew that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

183. Plaintiff and the class have suffered losses as a direct result of the Company Plan Fiduciaries' breach of their duty of loyalty.

184. Pursuant to 29 U.S.C. § 1109(a), the Company Plan Fiduciaries are liable to restore to the Plan all losses caused by their fiduciary breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**Breach of ERISA's Fiduciary Duty of Loyalty Under 29 U.S.C. 1104(a)(1)(A)
By the Company Plan Fiduciaries Regarding Allocation of Forfeited Plan Assets**

185.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

186.    When exercising discretion and control over Forfeited Plan Assets and using them to reduce Company's Non-discretionary matching contributions, instead of defraying the reasonable costs of administering the Plan or allocating the Forfeited Plan Assets back to eligible Plan Participants, the Company Plan Fiduciaries considered the best interest of Company and ignored the Plan document as opposed to the best interest of participants, in violation of ERISA.

187.    When improperly exercising discretion and control over Forfeited Plan Assets and failing to use them to defray the reasonable costs of administering the Plan or allocating them back to the accounts of eligible Plan Participants, the Company Plan Fiduciaries considered the best interests of Company, as opposed to Plan Participants, in violation of ERISA.

188.    Each Company Plan Fiduciary knowingly participated in the breach of the other Company Plan Fiduciaries, knowing that such acts were a breach, enabled other Company Plan Fiduciaries to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Company Plan Fiduciaries and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Company Plan Fiduciary is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

189.    Plaintiff and the class have suffered losses as a direct result of the Company Plan Fiduciaries' breach of their duty of loyalty.

190. Pursuant to 29 U.S.C. § 1109(a), the Company Plan Fiduciaries are liable to restore to the Plan all losses caused by their fiduciary breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

<u>**COUNT III**</u>
**Breach of the Duty of Prudence Under 29 U.S.C. 1104(a)(1)(B)**
**By the Company Plan Fiduciaries Regarding Allocation of Forfeited Plan Assets**

191. Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

192. When exercising discretion and control over Forfeited Plan Assets and using them to reduce Company contributions, the Company Plan Fiduciaries failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, when those aims are to act *solely* in the interest of the Plan participants and beneficiaries and for the exclusive purpose of providing benefits to Plan participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA.

193. In deciding how to allocate Forfeited Plan Assets, the Company Plan Fiduciaries failed to undertake a reasoned and impartial decision-making process. Rather than investigate whether using Forfeited Plan Assets to defray Plan Expenses before offsetting Non-Discretionary Employer Matching Contributions would have been better for Plan participants, the Company Plan Fiduciaries reflexively used Forfeited Plan Assets to reduce Company's own contribution expenses while only devoting 2% of Forfeited Plan Assets from Plan Years 2019-2022 toward Plan Expenses. The Company Plan Fiduciaries' imprudent process can be further inferred from the fact that, on information and belief, there was no risk of Company not making its Non-

Discretionary Employer Matching Contributions and no indication that Company's contribution levels were informed by the amount of Forfeited Plan Assets, and thus no benefit to participants from using Forfeited Plan Assets to offset Non-Discretionary Employer Matching Contributions instead of to defray Plan Expenses.

194.    By refusing to use Forfeited Plan Assets to eliminate the Plan Expenses charged to participant accounts, and instead deciding to use these Plan assets only to reduce Company's own contribution expenses, the Company Plan Fiduciaries caused participants to incur expense deductions from their individual accounts that would otherwise have been covered in whole or in part by utilizing the Forfeited Plan Assets to pay Plan Expenses.

195.    The Company Plan Fiduciaries also failed to investigate whether allowing millions of dollars of Forfeited Plan Assets to sit in an unallocated plan account at the end of each year instead of using those amounts to defray Plan Expenses was in the interest of the Plan and its participants. By instead allowing those Forfeited Plan Assets to remain unallocated, the Company Plan Fiduciaries caused the value of Plan Participants' individual accounts to decrease as a result of expense deductions that would otherwise have been defrayed in whole or in part by utilizing the Forfeited Plan Assets to pay Plan Expenses.

196.    Had the Company Plan Fiduciaries conformed with the minimum standard of care required under ERISA, the Company Plan Fiduciaries would not have used Forfeited Plan Assets to solely reduce Company contributions.

197.    Alternatively, had the Company Plan Fiduciaries conformed with the minimum standard of care required under ERISA, they would have used Forfeited Plan Assets to defray reasonable expenses of administering the Plan up to the amount of unallocated Forfeited Plan Assets.

198.   Plaintiff has suffered losses as a direct result of the Company Plan Fiduciaries breach of their duty of prudence.

199.   Pursuant to 29 U.S.C. § 1109(a), the Company Plan Fiduciaries are liable to restore to the Plan all losses caused by their fiduciary breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

### COUNT IV
### Fiduciary Prohibited Transactions/ Self-Dealing with
### Forfeited Plan Assets Under 29 U.S.C. 1106(b) By Company Plan Fiduciaries

200.   Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

201.   29 U.S.C. § 1106(b) provides that "[a] fiduciary with respect to a plan shall not (1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

202.   Defendants were and continue to be Plan Fiduciaries. In their management and control of Forfeited Plan Assets, Defendants caused the Plan to use Plan assets (Forfeited Plan Assets) to fund Company's contractual obligation to make Non-Discretionary Employer Matching Contributions to the Plan. By allocating these Plan assets toward offsetting Company's Non-Discretionary Employer Matching Contributions obligations, Defendants saved Company millions of dollars in contractually obligated Non-Discretionary Employer Matching Contributions expenses. Defendants therefore dealt with the assets of the Plan in their own interest or for Company's own account, in violation of 29 U.S.C. § 1106(b)(1).

42

203. Additionally, or alternatively, Defendants in their individual capacity or as an agent of Defendant Company acted in a transaction involving the Plan on behalf of a party (Defendant Company) whose interests are adverse to the interests of the Plan and the interests of Plan Participants and their beneficiaries in violation of 29 U.S.C. § 1106(b)(2) and received consideration for their own personal accounts from parties dealing with the Plan in connection with transactions involving the assets of the Plan (Forfeited Plan Assets) in violation of 29 U.S.C. § 1106(b)(3) through the mechanism of receiving higher bonuses than they otherwise would have received.

204. As a result of this prohibited conduct, Defendants caused the Plan and Plan Participants and class to suffer losses in the amount of the Plan assets that were substituted for Non-Discretionary Employer Matching Contributions and lost earnings on those assets.

205. Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the prohibited conduct alleged in this claim, to restore to the Plan all assets and profits obtained through the use of Plan assets and is subject to other equitable or remedial relief as appropriate.

### COUNT V
**Fiduciary Prohibited Transactions Benefiting Employer with
Forfeited Plan Assets under 29 U.S.C. 1106(a) by Company Plan Fiduciaries**

206. Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

207. 29 U.S.C. § 1106(a)(1) provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect. . . exchange. . . of any property between the plan and a party in interest . . . or use by or for the benefit of a party in interest, of any assets of the plan."

43

208. Defendants are parties in interest, as that term is defined under 29 U.S.C. § 1002 (14), because they are Plan Fiduciaries and because Company is the employer of Plan Participants.

209. The Plan's third-party administrators and other service providers are also parties in interest. *See Cunningham*, 145 S. Ct. at 1025 ("[ERISA], in turn defines a "party in interest'" to include various plan insiders, including the plan's administrator, sponsor, and its officers, as well as entities providing services to [the] plan.") (internal citations omitted).

210. When Defendants elected to use Forfeited Plan Assets as a substitute for future employer contributions to the Plan, thereby saving Company millions of dollars in Non-discretionary contribution expenses, Defendants caused the Plan to engage in transactions that constituted a direct or indirect exchange of existing Plan assets for future employer contributions and/or use of Plan assets by or for the benefit of a party in interest.

211. As a result of these prohibited transactions, Defendants caused the Plan to suffer losses in the amount of the Forfeited Plan Assets that were not used to defray Plan Expenses and lost investment returns on those assets.

212. Additionally, when Defendants elected to use Forfeited Plan Assets as a substitute for Non-Discretionary Employer Matching Contributions to the Plan and not for Plan Expenses, Defendants caused the Plan to engage in prohibited transactions with the Plan's third-party administrator and other service providers for the payment of Plan Expenses from Plaintiff and all Plan Participants' individual accounts, both directly and indirectly, that were sent to the Plan's third-party administrators and other third party service providers and that should have been paid in part or full by the Forfeited Plan Assets.

## COUNT VI
### Breach Of Erisa's Anti-Inurement Provision under 29 U.S.C. 1103(C)(1)
### by Company Plan Fiduciaries

213. Plaintiff realleges and incorporates herein by reference each preceding paragraph of this Complaint as though fully set forth herein.

214. Pursuant to 29 U.S.C. § 1103(c)(1), "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purpose of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."

215. The balance in a participant's accounts that a participant forfeits when incurring a break in service prior to full vesting of the Company's contributions to the participant's account is an asset of the Plan.

216. By electing to utilize the majority of these Plan assets as a substitute for the Company's own future contributions to the Plan, thereby saving the Company millions of dollars in contribution expenses, Defendants caused the assets of the plan to inure to the benefit of the employer and failed to defray reasonable expenses of the plan in violation of 29 U.S.C. § 1103(c)(1) and 29 U.S.C. § 1104(a)(1)(A).

217. Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from violation of ERISA's anti-inurement provision as alleged in this claim and to restore to the Plan all profits secured through their use of Plan assets. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in the Prayer for Relief.

218. Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled other Defendants to commit a breach by failing

45

to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

## **PRAYER FOR RELIEF**

For these reasons, Plaintiff, on behalf of the Plan and all similarly situated participants and beneficiaries, respectfully requests that the Court:

a. Find and declare that Defendants breached their fiduciary duties, ERISA's anti-inurement provisions, and engaged in prohibited conduct and transactions as described above;

b. Find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each violation of ERISA described above, and to otherwise restore the Plan to the position it would have occupied but for these violations;

c. Order the disgorgement of all assets and profits secured by Defendants as a result of each violation of ERISA described above;

d. Determine the method by which Plan losses under 29 U.S.C. §1109 should be calculated;

e. Order Defendants to provide all accounting necessary to determine the amounts Defendants must make good to the Plan under 29 U.S.C. § 1109(a);

f. Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

g. Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive, and/or in violation of ERISA;

h. Certify the class, appoint Plaintiff as class representative, and appoint The Sharman Law Firm LLC and Kennedy Hunt P.C. as class counsel;

46

i. Award to Plaintiff and the class their attorneys' fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

j. Order the payment of interest to the extent it is allowed by law; and

k. Grant other equitable or remedial relief as the Court deems appropriate.

Respectfully submitted,

**KENNEDY HUNT P.C.**
/s/*Sarah Jane Hunt*
Sarah Jane Hunt
Missouri Bar No. 63899
4500 W Pine Blvd
St. Louis, MO 63108
Tel: (314) 872-9041
Fax: (314) 872-9043
sarahjane@kennedyhuntlaw.com

**THE SHARMAN LAW FIRM LLC**
/s/*Paul J. Sharman*
PAUL J. SHARMAN (*pro hac vice* to be filed)
Georgia State Bar No. 227207
11175 Cicero Drive, Suite 100
Alpharetta, GA 30022
Email: paul@sharman-law.com
Phone: (678) 242-5297
Fax: (678) 802-2129
***Attorneys for Plaintiff and Proposed Class***